THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|                              |   |                                   |
|------------------------------|---|-----------------------------------|
| JAMAL S. HANSON,             | : | HONORABLE JEROME B. SIMANDLE      |
|                 Plaintiff,   | : |                                   |
|          v.                  | : | Civil No. 06-3683 (JBS/JS)        |
|                              | : |                                   |
| UNITED STATES OF AMERICA,    | : |                                   |
|                 Defendant.   | : | **OPINION**                       |

APPEARANCES:

Mr. Jamal S. Hanson
#22873-016
F.C.I. Allenwood
P.O. Box 2000
White Deer, PA 17887-2000
     Plaintiff appearing pro se

Paul J. Fishman
United States Attorney
     By: Mark Christopher Orlowski
          Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
402 East State Street, Room 430
Trenton, NJ 08608
     Counsel for Defendant United States of America

**SIMANDLE**, District Judge:

     This action arises out of an incident at the Federal
Correctional Facility in Fort Dix, New Jersey ("FCI Fort Dix") in
which a Bureau of Prisons ("BOP") officer at FCI Fort Dix
allegedly slammed Plaintiff's head on the floor and choked
Plaintiff in an attempt to force Plaintiff to spit out contraband
that Plaintiff was attempting to swallow.  Presently before the
Court is a motion for summary judgment [Docket Item 39],

submitted by Defendant the United States of America, seeking
judgment on Plaintiff's claim brought pursuant to the Federal
Tort Claims Act ("FTCA").  For the reasons expressed below, the
Court will deny Defendant's motion for summary judgment.

I.   **BACKGROUND**

    **A.   Facts**[1]

    During the period relevant to this action, Plaintiff was an
inmate at FCI Fort Dix.  (Pl. Dep. at 10-11.)  On September 30,
2003, around 4 p.m., Plaintiff joined six other inmates in the
facilities' bocce ball court to smoke marijuana, which had been
rolled into a cigarette or "joint."  (Id. at 27-29.)  While the
men passed the marijuana cigarette back and forth, Lieutenant
Douglass Davis, with the Special Investigative Supervisor ("SIS")
division,[2] was in the prison chapel watching the men with
binoculars.  (Pl. Dep. at 29; Davis Decl. ¶ 6.)  As the men were
about to finish smoking their marijuana, Plaintiff heard the
squawk of a BOP officer's radio and Lieutenant's Davis'

_____

    [1] For the purposes of this summary judgment motion, the
Court will take Plaintiff's evidence to be true and draw all
reasonable inferences in his favor.  Modrovich v. Allegheny
County, Pa., 385 F.3d 397, 415 (3d Cir. 2004).  The Court
acknowledges that Defendant denies than any officer banged
Plaintiff's head on the ground or choked Plaintiff, (Davis. Decl.
¶ 17), and maintains that Plaintiff resisted the BOP officers'
attempts to restrain him, (id. ¶ 16).

    [2] As part of his duties as a SIS Lieutenant, David "gathered
intelligence on impermissible conduct, such as the transfer of
contraband between inmates."  (Davis Decl. ¶ 3.)

instructions to detain the inmates.  (Pl. Dep. at 30.)  On seeing
the officers approaching, Plaintiff took the marijuana that he
had in his possession, wrapped in paper, and stuck it down his
pants and between the cheeks of his buttocks.  (Id. ¶ 32-33.)

Lieutenant Davis, who saw Plaintiff stick something down the
back of his pants, approached the inmates and asked them where
they had put the "weed."  (Pl. Dep. at 33; Davis Decl. ¶ 6.)  The
officers lined the inmates against a fence and performed pat
searches of all the inmates, including Plaintiff, and then
brought the inmates back to the SIS office.  (Pl. Dep. at 35-36;
Davis Decl. ¶ 7.)  Once in the SIS office, the BOP officers
separated the inmates into different rooms and performed strip
searches.  (Pl. Dep. at 36-37.)  Lieutenant Davis and Officer
Miller brought Plaintiff into Davis' office and Davis ordered
Plaintiff to take off all of his clothes, which Plaintiff did.
(Pl. Dep. at 39; Davis Decl. ¶¶ 9-10.)  Lieutenant Davis then
gave Plaintiff a series of instructions for the search, including
lifting his feet and opening his mouth, and Plaintiff fully
complied.  (Pl. Dep. at 39-40; Davis Decl. ¶ 11.)  Finally, Davis
ordered Plaintiff to turn around, bend over and squat.  (Pl. Dep.
at 33; Davis Decl. ¶ 6.)  Plaintiff did not comply with Davis'
first request, but when Davis again asked Plaintiff to turn
around and squat, Plaintiff complied, revealing a green balloon
in his rectal area.  (Pl. Dep. at 40; Davis Decl. ¶ 12.)  Davis

3

states that recognized the balloon as the type used to smuggle drugs.  (Davis Decl. ¶ 13.)  Davis ordered Plaintiff to hand him the green balloon, but instead Plaintiff turned around so that he was facing Davis and put the balloon in his mouth and tried to swallow the balloon.  (Pl. Dep. at 40-42; Davis Decl. ¶ 14.)  Davis states that he interpreted Plaintiff's action as an act of aggression.  (Davis Decl. ¶ 15.)

In response to Plaintiff's conduct, Davis grabbed Plaintiff, picked him up, and slammed him on the ground.  (Pl. Dep. at 42.)  Davis used his radio to call for assistance and several officers entered Davis' office, including Officer Miele.  (Pl. Dep. at 43-44; Pl. Decl. ¶¶ 10-11.)  As soon as Officer Miele entered the office, Miele placed his knee on Plaintiff's back, kneeled so that his whole weight was pressed against Plaintiff's back, and wrenched Plaintiff's right arm behind Plaintiff's back (Plaintiff's left arm was pinned under his body).  (Pl. Dep. at 43-44, 54; Pl. Decl. ¶ 11.)  Lieutenant Davis stood up, at which point Officer Miele grabbed Plaintiff by his hair and began to bang Plaintiff's head and face on the ground.  (Pl. Dep. at 44, 55-56; Pl. Decl. ¶ 13.)  Miele banged Plaintiff's head three or four times on the ground.  (Pl. Dep. at 68-69.)  Davis told Miele to stop banging Plaintiff's head on the ground, and Miele let go of Plaintiff's head and instead grabbed his throat and began to choke Plaintiff.  (Pl. Dep. at 44-45; Pl. Decl. ¶ 14.)  Davis

4

again told Miele to stop, repeating that Miele should simply restrain Plaintiff and they would take Plaintiff to a "dry cell."[3]  (Pl. Dep. at 44; Pl. Decl. ¶ 15.)  Miele continued to choke Plaintiff, with added force, and repeatedly told Plaintiff, "Spit it out, Spit it out!"  (Pl. Dep. at 44; Pl. Decl. ¶ 16.) After several more seconds, Miele released Plaintiff's neck. (Pl. Dep. at 44; Pl. Decl. ¶ 17.)

On being released by Miele, Plaintiff had a metallic taste in his mouth and had difficulty breathing.  (Pl. Dep. at 45; Pl. Decl. ¶ 18.)  After putting two fingers in his mouth to see what was wrong with his mouth, Plaintiff swallowed blood and began dry-heaving.  (Pl. Dep. at 45; Pl. Decl. ¶ 18.)  In the process Plaintiff spit out the marijuana, which was covered in blood. (Pl. Dep. at 45; Pl. Decl. ¶ 18.)  The officers then handcuffed

---

[3] The U.S. Department of Justice, Federal Bureau of Prisons Program Statement dated June 30, 1997 on searching inmates provides in Section 552.12:

> [CLOSE OBSERVATION § 552.12]("DRY CELL" STATUS). [When there is reasonable belief that an inmate has ingested contraband or concealed contraband in a body cavity and the methods of search specified in § 552.11 are inappropriate or likely to result in physical injury to the inmate, the Warden or designee may authorize the placement of an inmate in a room or cell for the purpose of staff's closely observing the inmate until the inmate has voided the contraband or until sufficient time has elapsed to preclude the possibility that the inmate is concealing contraband.]

(Pl. Exh. 2.)

Plaintiff.  (Pl. Dep. at 45.)  A physician's assistant did a medical assessment and then Plaintiff was brought to the infirmary.  (Pl. Dep. at 70, 78-79; Pl. Decl. ¶ 22.)  The physician's assistant initially gave Plaintiff Motrin for the pain, but when that was insufficient she gave him Naproxen.  (Pl. Dep. at 78-79.)

As a result of this incident, Plaintiff had several cuts on his mouth and multiple bruises on his face, chest, and back. (Pl. Dep. at 57, 70; Pl. Decl. ¶ 21; Medical Report, Pl. Exh. 5.) He had continuing headaches and back aches.  (Pl. Dep. at 80.) He has permanent scars to his face and recurring lower-back pain. (Pl. Dep. at 88; Pl. Decl. ¶ 21.)

**B.   Procedural History**

In June or July 2005, Plaintiff prepared and submitted his administrative tort claim, pursuant to 28 U.S.C. § 2675(a), to the Federal Bureau of Prisons and on February 3, 2006, the BOP denied Plaintiff's claim.  (Compl. Exhs. 1-3.)  On August 2, 2006, Plaintiff submitted the instant complaint pursuant to the Federal Tort Claims Act, asserting that the BOP officers employed "excessive force" on September 3, 2003.  After some delay in proper service, Plaintiff served the United States in August 2007 and discovery was finally completed in July 2009.  On November 24, 2009, Defendant file its motion for summary judgment, to which it attached portions of Plaintiff's deposition and an

affidavit from Lieutenant Davis.  Plaintiff submitted an
opposition and included his entire deposition, an additional
declaration from Plaintiff, medical records, and two BOP Program
Statements.  Defendant filed no reply.

## II.  DISCUSSION

### A.  Standard of Review

A party seeking summary judgment must "show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  In deciding whether there is a disputed issue of material
fact, the court must view the evidence in favor of the non-moving
party by extending any reasonable favorable inference to that
party; in other words, "the nonmoving party's evidence 'is to be
believed, and all justifiable inferences are to be drawn in [that
party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255
(1986)).  The threshold inquiry is whether there are "any genuine
factual issues that properly can be resolved only by a finder of
fact because they may reasonably be resolved in favor of either
party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State
Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation
omitted).

**B.   Federal Tort Claims Act**

The present suit presents two questions.  First, the Court must determine by what standard to measure the United States' liability under the FTCA for the use of force by the BOP officers.  Second, the Court must determine whether, taking Plaintiff's evidence to be true, the United States should be held liable under that standard.  Both parties agree as to the applicable standard -- namely, both parties assert that New Jersey law should apply that that New Jersey courts would apply a "reasonableness" test, guided by the factors used to measure appropriate force under the Eighth Amendment.  The parties disagree as to whether, taking Plaintiff's evidence to be true, the BOP officers employed reasonable force.  For the reasons expressed below, the Court finds that "reasonableness" is the appropriate standard by which to measure the BOP officer's use of force under the FTCA and that the United States is not entitled to summary judgment because a reasonable fact finder could conclude that the amount of force used to recover this contraband was unreasonable.

The Federal Tort Claims Act ("FTCA" or "the Act"), enacted in 1946 and codified in multiple sections of Title 28 of the United States Code, "operates as a limited waiver of the United States's sovereign immunity." <u>White-Squire v. U.S. Postal Service</u>, 592 F.3d 453, 456 (3d Cir. 2010).  Under the FTCA, the

United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; see 28 U.S.C. § 1346(b) (providing exclusive jurisdiction to federal district courts over negligence claims against federal employees "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."). Consequently, the Court must look to the law of New Jersey, as the place of the accident, to determine whether the United States may be held liable for the conduct of the BOP officers. See Matsko v. United States, 372 F.3d 556, 559 (3d Cir. 2004).

Though generally exempted from liability under the Act for intentional torts, the United States remains liable for claims arising from certain intentional torts (including assault and battery) committed by "investigative or law enforcement officers"[4] while executing a search, seizing evidence, or making an arrest. 28 U.S.C.A. § 2680(h); Pooler v. United States, 787 F.2d 868, 872 (3d Cir. 1986). Moreover, it is well-established that a federal prisoner may bring suit under the FTCA. United States v. Muniz, 374 U.S. 148 (1963).

---

[4] For the purposes of Section 2680(h), "investigative or law enforcement officer" "means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

9

The question raised by the present motion involves the interaction between the private person standard under the FTCA and the standard of conduct for the use of force by federal law enforcement officers executing their special powers to conduct searches, seize evidence, and make arrests.  As a general rule, federal courts faced with FTCA claims arising out of the use of force by law enforcement officers during searches and arrests have applied local law governing law enforcement officers, rather than pure civilian law.  Villafranca v. United States, 587 F.3d 257, 261-64 (5th Cir. 2009) (applying Texas privilege for law enforcement officers using reasonable force); Arrington v. United States, 473 F.3d 329, 335-36 (D.C. Cir. 2006) (on agreement of the parties, applying District of Columbia legal standard governing a claim against police officers for assault and battery);  Washington v. Drug Enforcement Admin., 183 F.3d 868, 874 (8th Cir. 1999) (applying Missouri law on police use of force during searches); Ting v. United States, 927 F.2d 1504, 1514 (9th Cir. 1991) (applying California law governing the law of arrests pursuant to warrants); Nash v. United States, 897 F. Supp. 180, 182-83 (E.D. Pa. 1994) (applying Pennsylvania law for use of force by peace officers).  A recent decision from the Supreme Court, however, has caused at least one court to question whether this line of jurisprudence is flawed.

In United v. Olson, 546 U.S. 43 (2005), the Supreme Court overturned a Ninth Circuit decision applying Arizona law of municipal liability to an FTCA claim arising out of a mining accident.  The Supreme Court rejected "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver [under the FTCA] simply upon a finding that local law would make a 'state or municipal entity' liable."  Olson, 546 U.S. at 44 (internal citations omitted).  The Court observed that two of its prior decisions, Rayonier Incorp. v. United States, 352 U.S. 315 (1957) and Indian Towing Co. v. United States, 350 U.S. 61 (1955), held that the liability of the United States is not to be determined by local municipal liability law, but instead by law governing private entities.  Id. at 45-46.  The Olson Court, emphasizing the phrase "private person," concluded, "we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon" state municipal liability.  Id. at 46.  The Court went on to hold that the allegedly negligent federal mine inspectors should be held to the state law "Good Samaritan" standard for a private person who takes on the responsibility of warning the public and so induces reliance.  Id. at 46-47.

Olson, and its predecessors Rayonier and Indian Towing, stand for the proposition that the United States' waiver of

11

sovereign immunity is not to be determined solely by the degree
to which each state has waived its own immunity.  Congress
intended to avoid this "quagmire" and adopt the traditional
liability of a private entity.  Indian Towing, 350 U.S. at 65,
68-69.  All three cases involved federal employees accused of
negligently exercising their duty to protect the public; in
Olson, negligent federal mine inspectors led to a serious mine
accident, in Rayonier, negligent federal fire fighters failed to
properly control a forest fire, and in Indian Towing, members of
the Coast Guard negligently operated a lighthouse causing a boat
to run aground.  What was not presented in any of these cases,
however, was the special prerogative of law enforcement officers
to use force while executing their obligations to search or
arrest.[5]  It would be a mistake, therefore, to apply Olson too

_____

[5] The United States, while arguing that the Ninth Circuit
ignored the plain language of the Act when it applied Arizona law
of municipal liability in Olson, noted that use of force by
federal law enforcement officers raised separate questions that
were not before the Supreme Court:

> [C]ases involving law enforcement officers like FBI
> or DEA Agents or Park Rangers may sometimes raise
> distinct issues that are not presented here, such
> as the privileges or prerogatives that such
> officers necessarily have to arrest suspects where
> in other circumstances such conduct would
> constitute assault or battery.  See, e.g.,
> Washington v. DEA, 183 F.3d 868, 874 (8th Cir.
> 1999).  Often such special privileges or
> prerogatives are part of broader principles of
> state law that encompass actions by private
> individuals as well.  See, e.g., Restatement §§ 10,
> 63, 65, 76, 114, 119, 120A, 121, 196, 197.  And

broadly.

The Third Circuit has not tackled the impact, if any, of
Olson on FTCA claims alleging excessive force by federal law
enforcement officers.  The Court of Appeals for the District of
Columbia, more than a year after the Olson decision, applied the
District of Columbia privilege for law enforcement officers to an
FTCA claim for excessive force, on agreement of the parties,
without mention of Olson.  Arrington, 473 F.3d at 335-36.  The
Eighth Circuit applied the Texas law enforcement privilege to use
reasonable force after concluding that "Olson's holding concerns
only whether state or municipal entity liability is an
appropriate analogy for the Government's liability" under the
FTCA.  Villafranca, 587 F.3d at 261-64.  In Tekle v. United
States, 511 F.3d 839 (9th Cir. 2007), the Ninth Circuit was
unable to reach a majority opinion on Plaintiff's FTCA claims,
with Judge Tashima finding that under Olson the law of civilian
arrest should be applied to the conduct of the Internal Revenue

---

> federal law itself also confers certain privileges,
> or immunity from regulation under state law, on
> federal officers in certain circumstances.  See In
> re Neagle, 135 U.S. 1, 61-63, 68-70, 76 (1890)
> (holding federal Marshal not liable under
> California law for killing a man who attacked a
> United States Supreme Court Justice, as the Marshal
> was "acting under the authority of the law of the
> United States, and was justified in so doing").  The
> Court need not consider such issues here, however.

Brief of Petitioner-Appellant at 24 n.7, United v. Olson, 546
U.S. 43 (2005).

Service ("IRS") special agents executing an arrest and search warrant, id. at 851-55, Judge Fisher concurring in result but suggesting that a federal law enforcement privilege should apply, id. at 856-59, and Judge Kleinfeld concurring in result but finding that the court should not reach the FTCA claim because the plaintiff had not raised it on appeal, id. at 861-62.

The Court concludes that neither Olson nor its predecessors require the Court to apply civilian rules regarding force to determine whether under the Act a law enforcement officer employed excessive force while executing his duties.  While it is clear that the United States is not bound by local municipal liability law, because Congress has set up a separate scheme for waiver of sovereign immunity under the FTCA, and it is further clear that the United States may not avoid liability simply because federal employees have duties to warn and protect the public that are not identical to a private person's duties, it does not follow that the United States may be held liable under the FTCA for the otherwise lawful conduct of federal law enforcement officers executing their privilege to use reasonable force during a lawful arrest or search.  See Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) ("Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force.").

Congress' use of the word "private," as interpreted by the Supreme Court, is intended to preclude comparison to a public entity (i.e. governmental liability).  See Indian Towing, 350 U.S. at 65 ("Furthermore, the Government in effect reads the statute as imposing liability in the same manner as if it were a municipal corporation and not as if it were a private person, and it would thus push courts into the 'non-governmental' -- 'governmental' quagmire that has long plagued the law of municipal corporations.").  Application of the law enforcement privilege to an FTCA claim based on alleged excessive force by law enforcement agents entails applying the law of a private citizen -- common law torts of assault and battery -- without consideration of whether a municipality would be liable under local law, but taking into consideration the extraordinary obligations of law enforcement officers recognized by both federal and state law.[6]

---

[6] Over fifty years ago, the New Jersey Supreme Court observed:

> Police officers are not volunteers. They are armed and required to act to enforce the law. They may err in their judgment and exceed their authority in the sense that they misjudge the need for extreme measures or their right to resort to them. Yet, where the purpose is to comply with duty, it would be unreasonable to impose the measure of criminal responsibility applicable to the citizen whose involvement does not originate in a legal compulsion to act and who is free to turn away.

State v. Williams, 148 A.2d 22, 27 (N.J. 1959).

> To hold otherwise would lead to the absurd result that all federal arrests would subject the Government to tort liability under the FTCA absent a finding that the Government's actions conformed with the state's specific law regarding "private person" arrests. Instead, the appropriate "private person" analogy here is whether an individual, acting under color of state law, would be personally liable for assault in similar circumstances.

Villafranca, 587 F.3d at 264;  Tekle, 511 F.3d at 858 ("Construing the FTCA as preserving federal law enforcement privileges would also avoid an absurd result: that federal officers acting lawfully may nonetheless be held civilly liable if they do not conform their conduct to what is required of private citizens.") (Fisher, J., concurring); see United States v. Schneider, 14 F.3d 876, 880 (3d Cir. 1994) ("It is the obligation of the court to construe a statute to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose.").

Under New Jersey law, a law enforcement officer effecting a lawful arrest or search "may use such force as is reasonably necessary under the circumstances."  Hill v. Algor, 85 F. Supp. 2d 391, 411 (D.N.J. 2000) (citing State v. Williams, 148 A.2d 22, 29 (N.J. 1959)); State v. Simms, 849 A.2d 573, 577 (N.J. Super. Ct. App. Div. 2004) ("It is well settled that an officer effecting an arrest may use only such force as is reasonable under the circumstances . . .'); Noback v. Town of Montclair, 110 A.2d 339, 342-43 (N.J. Super. Ct. App. Div. 1955).  "Where a

16

police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery." Hill, 8 F. Supp. 2d at 411; Noback, 110 A.2d at 342 ("The law appears to be well established that a police officer in effecting an arrest has the right to use such force as appears reasonably necessary, being responsible, however, for the use of any excessive force."). "Whether the force used exceeded the needs of the occasion is to be determined on the basis of the facts as they reasonably appeared to the officer at the time of the occurrence." Williams, 148 A.2d at 29; Hill, 8 F. Supp. 2d at 411.

When faced with a tort claim against a police officer in a slightly different context[7], New Jersey courts have looked to the factors set out in Graham v. Connor, 490 U.S. 386, 395 (1989) for a Fourth Amendment violation in order to measure the reasonableness of force employed by a police officer incident to a search or arrest. See Whesper v. Police Officer Tulli, No. L-619-05, 2008 WL 582800, at *4-9 (N.J. Super. Ct. App. Div. Mar.

---

[7] New Jersey courts typically look at the reasonableness of a police officer's use of force when the officer raises the defense of qualified immunity under the New Jersey Tort Claims Act. New Jersey provides immunity for a public employee "if he acts in good faith in the execution or enforcement of any law." N.J. Stat. Ann. § 59:3-3. The United States has expressly declined to request this immunity in light of United States v. Muniz, 374 U.S. 150, 164 (1963), in which the Supreme Court stated, "we think it improper to limit [FTCA] suits by federal prisoners because of restrictive state rules of immunity."

5, 2008); <u>Hill</u>, 85 F. Supp. 2d at 411; <u>see also</u> <u>Alston v. City of Camden</u>, 773 A.2d 693, 703 (N.J. 2001) (court looks to <u>Graham</u> to determine objective reasonableness).  Though not expressly addressed by the New Jersey courts, the Court agrees with both parties and predicts that the New Jersey courts would look to the factors used to assess force under the Eighth Amendment when faced with a tort claim involving the use of force by a law enforcement officer against a prisoner.[8]  The factors to be addressed when considering excessive force claims by prisoners are:

> (1) the need for the application of the force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

<u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986)).

---

[8] The Court recognizes that "reasonableness" is not the standard for a constitutional violation under the Eighth Amendment.  <u>See</u> <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) ("In an excessive force claim [under the Eighth Amendment], the central question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'") (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)).  New Jersey tort law does not appear to distinguish between the use of force inside prison as compared to the use of force outside prison and Defendant does not make this distinction.  Instead, Defendant asks that the Court use the above factors to guide a reasonableness determination and the Court is convinced that the New Jersey courts would apply such an analysis when looking at force inside a prison.

The Court finds, taking Plaintiff's version of the alleged incident to be true, that the BOP officers employed unreasonable force while attempting to search Plaintiff for contraband. Though there was some need to use force against Plaintiff, who was refusing to comply with Lieutenant Davis' orders, there was no need for the degree of force allegedly employed by Officer Miele, which included banging Plaintiff's head on the ground and choking Plaintiff.  Plaintiff persuasively points to the BOP's own regulations, which call for placing an inmate in a "dry cell" where the inmate is closely regulated until the contraband passes through the inmate's system if other methods of search are "inappropriate or likely to result in physical injury." (Program Statement § 551.12, Pl. Exh. 2.)  Moreover, as alleged, Lieutenant Davis recognized that the degree of force being used by Miele was unnecessary, as reflected by Davis' repeated orders that Miele stop banging Plaintiff's head on the ground and choking Plaintiff.  The injuries Plaintiff allegedly suffered -- bleeding in the mouth, cuts, bruises, and recurring headaches and backaches -- further support the unreasonableness of the force allegedly employed to procure the small amount of marijuana that Plaintiff was holding in his mouth.  Even assuming the credibility of Lieutenant Davis' testimony that he interpreted the manner in which Plaintiff turned around to be aggressive, under Plaintiff's version of the facts, Plaintiff was thoroughly

subdued on the ground at the point that Miele slammed his head on the ground and choked him.  There was no significant risk to the officers' safety at this point.  See Davis v. Berks County, No. 04-01795, 2007 WL 516128, at *5 (E.D. Pa. Feb. 8, 2007)("Even though [plaintiff] bit [defendant correction officer], [plaintiff] was handcuffed throughout the incident, successfully placed back in his cell where he could have been locked down, and under the control of multiple guards.  Therefore, the extent of the threat to the staff and other inmates could not have been high . . . .").[9]  Though Davis made several requests that Miele stop assaulting Plaintiff, nobody physically intervened in the assault which allegedly lasted long enough that Plaintiff's mouth bled and he continued to have headaches.  Consequently, all five of the Brooks/Whitley factors support a finding that BOP officers employed unreasonable force against Plaintiff.

While the Court recognizes that prison officers must be able to enforce prison rules and regulate contraband, under New Jersey law they are only permitted to use reasonable force or be subjected to liability under the Federal Tort Claims Act.  See Hill, 8 F. Supp. 2d at 411; Williams, 148 A.2d at 29; see also

---

[9] Defendant cites two non-precedential opinions from the Third Circuit, Hughes v. Smith, 237 F. App'x 756 (3d Cir. 2007) and Camp v. Brennan, 54 F. App'x 78 (3d Cir. 2002).  To the extent that the Court is bound to consider these opinions, they are distinguishable because force was used in both to subdue a physical confrontation with an inmate.

Santiago v. Fields, No. 05-CV-4884, 2009 WL 693642 (E.D. Pa. Mar. 12, 2009) (BOP officers used excessive force in choking and kicking inmate who refused to open his mouth for a search and who spat at the officer); Simpson v. Hines, 903 F.2d 400 (5th Cir. 1990) (jail officers used excessive force on pre-trial detainee who refused to surrender contraband and his personal belongings when they placed him in a neckhold and sat on his chest so that he eventually died of asphyxiation).  Because there are genuine disputes of material fact regarding the degree of force used and the degree to which Plaintiff resisted being subdued, there remains a genuine dispute of material fact as to whether the BOP officers used reasonable force in holding and searching Plaintiff.  Plaintiff's evidence, if proved at trial, would be sufficient to support a finding of liability under the FTCA against the United States for damages proximately caused by this intentional tort.  The Court will deny Defendant's motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment.  The accompanying Order shall be entered.


**March 26, 2010**                        **  s/ Jerome B. Simandle    **
Date                                      JEROME B. SIMANDLE
                                          United States District Judge

21